**Below is a Memorandum Decision of the Court.**

_Paul B. Snyder_
_____
**Paul B. Snyder**
**U.S. Bankruptcy Court Judge**
(Dated as of Entered on Docket date above)

_____

## UNITED STATES PLAINTIFFRUPTCY COURT
## WESTERN DISTRICT OF WASHINGTON AT TACOMA

In re:

STEVEN L. CHAMBERLAIN,

                    Debtor.
_____

HOMESTREET BANK,

                    Plaintiff,

v.

STEVEN L. CHAMBERLAIN,

                    Defendant.

**Case No. 12-43245**

**Adversary No. 12-04314**

**MEMORANDUM DECISION**

**NOT FOR PUBLICATION**

Trial was held on this matter on May 13 and July 8, 2013, on the Objection to Discharge Pursuant to 11 U.S.C. § 523 and 11 U.S.C. § 727 (Complaint) filed by creditor HomeStreet Bank (Plaintiff) against Steven L. Chamberlain (Debtor/Defendant). The Court's oral ruling rendered on June 11, 2013, is incorporated herein by reference. Based on the pleadings, evidence and arguments presented, the following is the Court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.

The Plaintiff brought this Complaint following its foreclosure of the Tahoma Terra project (and its later sale to a third party) and a subsequent Washington State Superior Court

MEMORANDUM DECISION - 1

(State Court) lawsuit seeking a deficiency judgment against the Defendant. A default judgment in the amount of $1,110,868.65 was entered against the Defendant on January 6, 2012, in the State Court action. The Plaintiff's allegations were limited to requesting relief based on a guaranty of a $17.5 million dollar Promissory Note (Note) in favor of the Plaintiff. No mention was made in the State Court lawsuit of fraud or failure to maintain records by the Defendant.

The Defendant is a civil engineer and had worked as a real estate developer engaging in several substantial projects in the Northwest. Prior to 2006, he had developed and sold hundreds of residential and commercial properties. In 2009, he had five separate large land development projects remaining in his portfolio in various stages of completion, including a 1,250 acre master plan development called Thurston Highlands, a 220 acre Tahoma Terra development, and a residential lot development referred to as Eagles Court. The latter two projects were financed by the Plaintiff. This adversary proceeding, however, concerns Tahoma Terra, which consisted of a multi-phased planned community development in Yelm, Washington, intended to be annexed by that city when completed.

In 2009, the Defendant had approximately $30 million in outstanding Plaintiff loans on his remaining projects. The Plaintiff was one of several lenders on the Defendant's numerous real estate projects. The Plaintiff was the lender of the Defendant's Tahoma Terra development project, which originated in 2006 with a loan from the Plaintiff at over $17.5 million. Prior to obtaining the Plaintiff's loan, the Defendant's projects had a number of pre-sale commitments from Quadrant Homes, a large residential home builder in the region. Quadrant Homes would close sales as the Defendant's project lots were completed.

Similar to other real estate developers, the Defendant's projects came under stress in the recession commencing in the latter part of 2008. Quadrant Homes declined to renew its commitment to close on the Tahoma Terra project lots as they were completed. The market for developed lots and commercial space collapsed and the Plaintiff indicated it no longer intended

MEMORANDUM DECISION - 2

to extend credit to the Defendant's projects in 2009. The Defendant still attempted to complete his current projects, sell the lots and pay down the several lender loans.

The Defendant provided the Plaintiff with several personal financial statements between 2006 and 2009. In an Individual Financial Statement dated as of March 31, 2006, the Defendant identified total assets of over $88 million, including a Chinese Bond (described therein as "American Bond Holder" and referred to in this Memorandum Decision as "Chinese Bond") he speculated had a value of $8 million. The Defendant also listed the Chinese Bond as an asset with a value of $8 million in his Individual Financial Statements dated October 31, 2006, June 30, 2007, December 30, 2007, and June 30, 2008. In the Individual Financial Statements, the Defendant represented the source of the valuation for the Chinese Bond as "ABF." The Defendant has admitted in testimony that the true source of the $8 million valuation was not the ABF, but based upon his own calculations.

The Chinese Bond was issued in 1913 in pre-communist China. The Defendant originally acquired the asset for $5,000 and sold the asset for the same price in 2009.

The Chinese Bond is also listed in the Residential Construction Asset Quality Review (AQR) dated May 6, 2006, that was prepared by the Plaintiff in connection with its loan approval process. The AQR presents a short list of strengths supporting the request for approval of the $17.5 million loan. One of the listed strengths is the substantial combined outside net worth of the guarantors, including the Defendant. Another listed strength is the Defendant's representation regarding the bond asset. In the "Guarantor Analysis," the AQR documents Plaintiff's internal calculation of the Defendant's net worth. The individual components of that calculation include the Chinese Bond at the $8 million valuation.

The AQR further reflects the Defendant's oral speculation to the Underwriter (Alexander/Peckham) and Loan Officer (Wendy Avila) that the Chinese Bond could be worth up to "$40MM:"

MEMORANDUM DECISION - 3

Guarantor Steven Chamberlain has advised Underwriter and Loan Officer that he could realize up to $40MM in cash from the liquidation of pre communist China bonds. Per Chamberlain negotiations between the US and China are ongoing in which the US is pressuring China to make good on the bonds. Reportedly China made good on its bonds with the UK when Thatcher was Prime Minister.

Plaintiff's Ex. 9, AQR at 2.

Tahoma Terra did not pay the Note on maturity and the Plaintiff initiated foreclosure proceedings. On April 9, 2010, the Plaintiff was the successful bidder at a Trustee's Sale held on the Deed of Trust securing the Note. On that date, the amount owing on the Note, including interest, costs and fees was $16,860,171.46. The Plaintiff's winning bid was $16,014,849.

On January 6, 2012, the State Court entered a default judgment in the amount of $1,110,868.65 against the Defendant in favor of the Plaintiff. The judgment was comprised of the deficiency amount of $845,322.46 and $265,546.19 in prejudgment interest.

The Defendant filed a voluntary Chapter 7 bankruptcy petition on May 9, 2012. The Plaintiff filed the pending adversary proceeding on August 17, 2012.

In its Complaint, the Plaintiff sought relief under 11 U.S.C. § 523(a)(2)(a) and (b), and (a)(4), and under § 727(a)(2), (3) and/or (5). The Plaintiff's Complaint did not specify the exact grounds that formed the basis of these claims, other than to generally mention overvaluation of securities, which appears to be the Chinese Bond, and the alleged concealment of a Belizean Account. The Belizean Account was apparently opened by the Defendant in 2010. The account was not originally disclosed in the Defendant's bankruptcy schedules. The Defendant's Schedule B was subsequently amended on August 17, 2012, to list an account with Choice Bank Limited in Belize with a value of $600.00, and then again on August 31, 2012, to increase the value to $1,069.59.

As noted by the Court in its oral decision rendered June 11, 2013, and incorporated herein by reference, it has been difficult in this case to determine what claims the Plaintiff is still

MEMORANDUM DECISION - 4

pursuing. It was at trial that the Plaintiff indicated that it was abandoning its claims under 11 U.S.C. § 523(a)(4), and (a)(6) and § 727(a)(2).

During trial, the Plaintiff also requested a continuance to conduct additional discovery. After additional briefing from both parties, an order was entered on June 11, 2013, denying the request to reopen discovery. The trial was concluded on July 8, 2013.

The Plaintiff's remaining claims seek relief under 11 U.S.C. § 523(a)(2)(A) and (B) and 11 U.S.C. § 727(a)(3). The law as to the Defendant's discharge and the dischargeability of a debt is clear. Creditors alleging nondischargeability under 11 U.S.C. § 523 have the burden of proof of each element by preponderance of the evidence. <u>Grogan v. Garner</u>, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991). The burden of proof under 11 U.S.C. § 727 also is a preponderance of the evidence. <u>Hoose v. Beauchamp (In re Beauchamp)</u>, 236 B.R. 727, 730 (9th Cir. BAP 1999) (citing <u>Grogan</u>, 498 U.S. at 284).

The Plaintiff has indicated that it is pursuing a nondischargeability claim under both 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B). 11 U.S.C. § 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(B), on the other hand, specifically excepts a debt from discharge where it was obtained through the use of a false written statement of financial condition.

It is recognized that these sections are mutually exclusive. "Thus, allegations of fraudulent misrepresentation concerning [Defendant's] financial condition may only be pled under the specific statute, § 523(a)(2)(B)." <u>McCrary v. Barrack (In re Barrack)</u>, 217 B.R. 598, 605-06 (9th Cir. BAP 1998). The only misrepresentations alleged in this case relevant to a 11 U.S.C. § 523 claim concern the value of the Chinese Bond. Allegations of fraud relating to the Belizean Account were not developed or discussed in the Plaintiff's pleadings or at trial. The

MEMORANDUM DECISION - 5

claim concerning the Chinese Bond value appears to be "statements in writing respecting the debtor's or an insider's financial condition."  Assuming that interpretation is correct, the Plaintiff is limited to seeking nondischargeability of its debt under 11 U.S.C. § 523(a)(2)(B).  This Court is aware that the Ninth Circuit Bankruptcy Appellate Panel (BAP) has recently determined that the phrase statement respecting "financial condition" should be narrowly construed to apply only to statements reflecting a debtor's overall financial condition or health.  Barnes v. Belice (In re Belice), 461 B.R. 564, 577-79 (9th Cir. BAP 2011).  It is unnecessary, however, for this Court to determine whether the statements in this case meet the "financial condition" definition, because the Court concludes that the Plaintiff has failed to establish that the debt is nondischargeable under either 11 U.S.C. § 523(a)(2)(A) or (B).

In order to establish nondischargeability under 11 U.S.C. § 523(a)(2)(A), a creditor must prove actual fraud.  In the Ninth Circuit, a creditor cannot prove actual fraud without establishing by a preponderance of the evidence: (1) that the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.  Citibank (South Dakota), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1086 (9th Cir. 1996).

In order to establish nondischargeability under 11 U.S.C. § 523(a)(2)(B), the creditor must prove by a preponderance of the evidence that (1) the debtor made a representation of fact; (2) that was material; (3) that the debtor knew at the time to be false; (4) that the debtor made with intent to deceive the creditor; (5) upon which the creditor relied; (6) that the creditor's reliance was reasonable; and (7) that damage proximately resulted from the representation.  Barrack, 217 B.R. at 604.  Although not identical, the Ninth Circuit recognizes that the elements of the two subsections of 11 U.S.C. § 523(a)(2) are substantially similar.  Nw.

MEMORANDUM DECISION - 6

Nat'l Ins. Co, of Milwaukee, WI v. Siriani (In re Siriani), 967 F.2d 302, 304 (9th Cir. 1992). The Court will therefore analyze the Plaintiff's claims under both subsections simultaneously, discussing any differences where necessary.

For purposes of either 11 U.S.C. § 523(a)(2)(A) or (B), there is no dispute that the Defendant made a written representation regarding the Chinese Bond by disclosing it as an asset in the Financial Statements provided to the Plaintiff for purposes of securing the loan. The Defendant also admits that oral representations were made regarding the Chinese Bond to both the Plaintiff's Loan Officer and Underwriter in the loan approval process. It is also undisputed that the Defendant represented the value as $8 million in his Individual Financial Statements and the value was not based on the ABF as indicated.

In regards to 11 U.S.C. § 523(a)(2)(B), the Plaintiff has failed to demonstrate, however, that the representations were material and that for purposes of both 11 U.S.C. § 523(a)(2)(A) and (B) that the Plaintiff relied on such representations. The most credible and persuasive testimony establishes that while the Plaintiff may have considered the Chinese Bond an additional "strength," Ms. Avila's deposition testimony establishes by a preponderance of the evidence that the Chinese Bond was not a significant factor in the Plaintiff's decision to approve the loan of $17.5 million to the Defendant. Although final approval of the loan was left to the Plaintiff's Loan Committee, Ms. Avila was the Loan Officer in charge of this loan. It was her opinion that the Chinese Bond was too speculative and due to its illiquidity, an insignificant factor in determining whether to approve the loan. Avila Dep., 62:25-63:1-25, April 22, 2013. Ms. Avila was present at the Loan Committee meeting at which the loan was approved and has stated that it is her recollection that the Chinese Bond was not even discussed at that meeting. Avila Dep., 65:2-4. The Loan Committee member who testified at the trial also did not recall any discussion of the Chinese Bond. Ms. Avila stated that the only discussions regarding the Chinese Bond took place when she, the underwriter and the Defendant met during the loan

MEMORANDUM DECISION - 7

process. There is no evidence to indicate that the Defendant did not truthfully advise them, as alleged, that the Chinese Bond was speculative and that to be paid, the current Chinese government would have to accept responsibility for payment of a bond issued in 1913 during a pre-communist period. In addition, and perhaps more significant, it is undisputed that during the loan approval process, the Defendant's net worth far exceeded the loan amount (by tens of millions of dollars) without taking the Chinese Bond into consideration.

Other than the Chinese Bond being listed as a "strength" in recommending loan approval, the Plaintiff has failed to present any evidence to contradict Ms. Avila's unequivocal statement that the Chinese Bond was not a significant factor in approving the loan. Avila Dep., 63:3. Ms. Avila's statements are further supported by the fact that the Plaintiff never requested any additional information from the Defendant to verify the value of the Chinese Bond. The Plaintiff's representatives primarily responsible for facilitating this loan and making recommendations and reports to the Loan Committee, Ms. Avila and Mr. Peckham (underwriter), both testified that they did not conduct any independent investigations or seek additional information from the Defendant to verify the value of the Chinese Bond. A preponderance of the evidence, the credibility of the parties, and the testimony provided establish that the Chinese Bond was not material to the Plaintiff's decision to approve the loan to the Defendant. The most persuasive evidence indicates that this loan would have been approved regardless of the value placed on the Chinese Bond by the Defendant.

For the same reasons that the Plaintiff is unable to establish that the Defendant's representations regarding the Chinese Bond were material, the Plaintiff is unable to establish that it relied on such representations in approving the loan. There is no reliance where the representation was not material to the Plaintiff's decision to loan funds.

In addition, even if the Plaintiff could establish that it relied on the representations regarding the Chinese Bond in approving the loan to the Defendant, the Plaintiff has not

MEMORANDUM DECISION - 8

**Below is a Memorandum Decision of the Court.**

established by a preponderance of the evidence that this reliance was "justifiable" as required by 11 U.S.C. § 523(a)(2)(A) or "reasonable" as required by 11 U.S.C. § 523(a)(2)(B).

Justifiable reliance, as opposed to reasonable reliance, is a subjective standard that turns on a person's knowledge under the particular circumstances. Eashai, 87 F.3d at 1090. Generally, neither standard imposes a duty to investigate. See Eashai, 87 F.3d at 1090-91 (analyzing justifiable reliance); Johnson & Johnson, Fin. Corp. v. Gertsch (In re Gertsch), 237 B.R. 160, 170 (9th Cir. BAP 1999) (analyzing reasonable reliance). Although either requirement is a fairly low hurdle for a creditor to meet in this circuit, a creditor is not entitled to rely upon an obviously false representation. See, e.g., Eashai, 87 F.3d at 1090-91 (justifiable reliance); Deutsche Fin. Servs. Corp. v. Osborne (In re Osborne), 257 B.R. 14, 21-22 (Bankr. C.D. Cal. 2000) (reasonable reliance). Again, assuming that the Plaintiff did rely upon the Defendant's representations regarding the Chinese Bond, numerous "red flags" appear in this case that should have alerted the lender that further investigation should have been conducted. See Heritage Pac. Fin., LLC v. Machuca (In re Machuca), 483 B.R. 726, 736-37 (9th Cir. BAP 2012).

In the instant case, it is evident from the testimony provided that the Defendant listed the Chinese Bond on his personal financial statements at a value that was clearly speculative and unsupported. The preponderance of the evidence indicates that the Plaintiff, through its employees, was aware that the value of the Chinese Bond was speculative in nature and did nothing to inquire as to the Bond's value. Although the loan underwriter knew of the speculative nature, he admits that he did not ask for copies of the bond, appraisals or market information, or in any way seek it to be pledged as collateral for the development loan. It would be remarkable if the Plaintiff actually relied on the Chinese Bond as an asset in approving the loan, yet did not undertake one scintilla of investigation as to how it was valued. This, after all, was a pre-communist bond that had no face value, was issued in 1913, and that

MEMORANDUM DECISION - 9

in order to be paid would have to be recognized by a communist government. There was also no discussion of the Chinese Bond by the Loan Committee and according to Ms. Avila, it was eventually removed from the Defendant's personal financial statement due to its speculative nature. There is no evidence that the Plaintiff ever voiced any concern about its later omission from the Defendant's subsequent personal financial statements.

The Plaintiff has also failed to establish that the Defendant valued the Chinese Bond at $8 million with an intent to deceive. As stated above, this bond had little or no value unless the Chinese government chose to honor it, and Ms. Avila admitted in her deposition testimony that she was aware that the value was speculative. Further, there is no evidence that this statement was false. The Defendant has testified that the Chinese Bond could be worth $8 million if the Chinese government agreed to honor it. No evidence has been presented to indicate that this is not the case. In addition, Ms. Avila also stated in her deposition testimony that she does not believe that she, as the Loan Officer in charge of this loan and a representative at the time of the Plaintff, was "misled" by the Defendant. Avila Dep., 73:16-18. Based on her uncontradicted deposition testimony, the Court concludes that the Plaintiff has failed to establish an intent to deceive.

In summary, the Court concludes that the Plaintiff has not established by a preponderance of the evidence that the Defendant made a false representation to the Plaintiff with an intent to deceive, as he advised the Plaintiff's representatives of the speculative nature of the bond's value. The statement was also not material as the Plaintiff did not rely on the representation in approving the loan request. Further, any reliance was not justifiable or reasonable as the Plaintiff did absolutely no investigation as to the bond's value despite numerous red flags. The Court is aware that little investigation, if any, is required; however, the fact that the Chinese Bond was so obviously speculative should have put the Plaintiff on notice.

MEMORANDUM DECISION - 10

The Plaintiff has failed to meet its burden in demonstrating that the debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A) or (B).

11 U.S.C. § 727(a)(3) precludes a discharge when the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the Debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under the circumstances of the case.

As stated above and in the Court's oral ruling of June 11, 2013, the Plaintiff's 11 U.S.C. § 727(a)(3) claim has not been developed throughout these proceedings. In fact, although the claim was referenced in the Plaintiff's trial brief, the brief contained no argument to support it. The basis for the claim has thus been difficult to recognize. Throughout these proceedings, the reason given by the Plaintiff for the filing of the 11 U.S.C. § 727(a)(3) action related solely to allegations concerning the Chinese Bond and the Belizean Account. See Pl's. Answer to Def.'s First Interrog. Nos. 18-19. Although the Belizean Account was not listed in the Defendant's original schedules, the schedules were later amended to disclose this asset. In addition, such failure is not the type of omission addressed by 11 U.S.C. § 727(a)(3). This section addresses the failure to maintain adequate business records, not errors in completing schedules. See Depue v. Cox (In re Cox), 462 B.R. 746, 762 (Bankr. D. Idaho 2011) (debtor's failure to properly complete his or her schedules or SOFA does not address the inquiry required under § 727(a)(3)). No credible evidence was presented that the Defendant concealed, destroyed, mutilated, falsified or failed to maintain adequate business records concerning either of these assets.

To prevail on a claim under 11 U.S.C. § 727(a)(3), bankruptcy courts have held that the plaintiff must demonstrate that (1) the defendant failed to keep or preserve adequate records; and (2) that such failure made it impossible for the plaintiff to ascertain the defendant's financial

MEMORANDUM DECISION - 11

condition and material business transactions.  <u>Sun Cmtys. Operating Ltd. P'ship v. Caneva (In re Caneva)</u>, 550 F.3d 755, 761 (9th Cir. 2008).   The Plaintiff has failed to articulate what necessary financial records were not preserved by the Defendant.  The Plaintiff examined both the Defendant's and Doug Bloom's personal financial records over a three year period of time.  The Defendant provided all records and documents to the Plaintiff during the life of his administration of the Tahoma Terra development loan to the Plaintiff as requested.   The Plaintiff had in its possession all of the Defendant's Financial Statements and relevant tax returns.  Due to the loan approval process, most financial records were already in the Plaintiff's possession or could have easily been obtained from other sources.   The Plaintiff's post-bankruptcy claim that important records have not been retained has not been established by a preponderance of the evidence.

Accordingly, the Court concludes that the Plaintiff has failed in its burden of proof and the Defendant is entitled to a discharge.


///End of Memorandum Decision///

MEMORANDUM DECISION - 12